United States District Court
District of Massachusetts

```
                                 )
JAGEX LIMITED,                   )
          Plaintiff,             )
                                 )
          v.                     )    Civil Action No.
                                 )    10-10216-NMG
IMPULSE SOFTWARE, ERIC SNELLMAN  )
and MARC SNELLMAN,               )
          Defendants.            )
                                 )
```

**MEMORANDUM & ORDER**

GORTON, J.

In the instant case, plaintiff Jagex Limited ("Jagex"), the
owner of an interactive computer game, has brought various claims
against defendants Impulse Software, Eric Snellman and Mark
Snellman for copyright and trademark infringement.  Before the
Court are defendants' motion to dismiss for lack of jurisdiction
and plaintiff's motion for preliminary injunction.

## I.  Factual Background

Plaintiff Jagex, a foreign corporation organizing under the
laws of the United Kingdom, owns and operates "Runescape," a
massive multi-player online game ("MMOG").  In 2008, the Guinness
Book of World Records recognized Runescape as the world's most
popular free online role-playing game, with over 130 million
accounts created since the launch of the game in 2001.

Runescape operates in a fantasy world in which a player
guides a customizable avatar (a virtual character) through a

-1-

visually stimulating environment, completing goals and objectives
as set by the player.  Players interact with one another by
trading, chatting or participating (cooperatively or combatively)
in mini-games and challenges.

A player may choose either to play Runescape for free,
whereby he gains basic access to the game or to pay for a
subscription which provides access to additional levels and
skills.  Succeeding at either version of Runescape entails a
substantial commitment of time and effort.  For example, as of
October, 2009, the three highest-ranked players had each spent an
average of approximately 20,000 hours involved in a game, e.g.,
50 hours per week for almost eight years.  As players progress,
they are rewarded with "experience points" and virtual "gold
coins" which symbolize status in the Runescape community and
allow the players to acquire resources and complete quests more
effectively.

The defendants, Eric and Mark Snellman, both of whom reside
in Florida and do business as Impulse Software, (collectively,
"the Snellman brothers") operate several websites which offer
tools that allow players to cheat at MMOGs such as Runescape.
More specifically, the Snellman brothers develop and sell a
software program called "iBot" or "Bot" (gamer jargon for
"robot") that enables Runescape users to advance their characters
through the game with little or no human participation.

-2-

The Bot software functions by downloading a copy of
Runescape from the free, online website and using a process
called "reflection" to examine the game's internal operation
which is normally hidden from users.  The Bot software uses this
information to identify objects within the Runescape game with
which it wishes to interact and then completes a desired task
according to instructions from a script.  In essence, the Bot
plays the game for its owner while she is away from her computer.
The defendants' technology allows a Bot user to progress more
rapidly than a player who completes each task manually, thereby
giving the Bot user an unfair advantage over the "honest" player
and allegedly resulting in a diminished experience for the gaming
community as a whole.

Jagex alleges that although Runescape's Terms and Conditions
expressly prohibit the use of such Bots, more and more players
have begun to use them.  As a result, honest players have
purportedly become frustrated and stopped playing the game and
new players are increasingly reluctant to sign up.  Jagex also
claims that since being served with the complaint in this
lawsuit, the Snellman brothers have launched a new website from
which they sell the allegedly infringing Bots.

## II.  Procedural History

On February 9, 2010, Jagex filed a four-count complaint
against the Snellman brothers alleging 1) copyright infringement,

-3-

2) violation of the Digital Millennium Copyright Act, 3)
trademark infringement under the Lanham Act and 4) violation of
the Computer Fraud and Abuse Act. The defendants responded by
moving to dismiss for lack of personal jurisdiction and improper
venue. In the alternative, they seek transfer to the United
States District Court for the Middle District of Florida, where
they both reside. Jagex also seeks a preliminary injunction
prohibiting the defendants from selling and promoting their
allegedly infringing software.

The Court convened a motion hearing on July 27, 2010, at
which time it announced its tentative rulings and posed various
questions to the parties. Having fully considered the parties'
written submissions and oral arguments, the Court now publishes
its decision.

## III. Legal Analysis

### A.   Defendant's Motion to Dismiss [Docket No. 16]

The defendants have moved to dismiss the plaintiff's claims
on the grounds that 1) the Court lacks personal jurisdiction over
the defendants, both of whom are Florida residents and do not
operate any offices or manufacture their products in
Massachusetts, and 2) venue is improper in Massachusetts.[1]
Alternatively, they move the Court to transfer the case to the

---

Given that Impulse Software is not a legal entity,
personal jurisdiction is dependent on the activities of the two
individual defendants.

-4-

Middle District of Florida, Orlando Division.

## 1. Exercise of Personal Jurisdiction in Massachusetts

On a motion to dismiss for want of personal jurisdiction, the plaintiff bears of the burden of demonstrating that jurisdiction is 1) statutorily authorized and 2) consistent with the Due Process Clause of the United States Constitution. Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1, 8 (1st Cir. 2009). Because the Massachusetts long-arm statute reaches to the full extent that the Constitution allows, the Court will proceed directly to the Constitutional analysis. See Tatro v. Manor Care, Inc., 625 N.E.2d 549, 553 (Mass. 1994).

Due Process requires that the defendants have "minimum contacts" with the forum state such that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The First Circuit employs a tripartite analysis to determine whether specific jurisdiction is appropriate.[2] The court inquires as to: 1) whether the claims arise out of or are related to the defendants' in-state activities, 2) whether the defendants have purposefully availed themselves of the laws of the forum state and 3) whether the exercise of jurisdiction is reasonable under the circumstances. See, e.g., Platten v. HG

---

[2] Although the plaintiff does not expressly allege specific jurisdiction, general jurisdiction is unwarranted.

<u>Bermuda Exempted, Ltd.</u> 437 F.3d 118, 135 (1st Cir. 2006).

## a. Relatedness

The "relatedness" test is a "flexible, relaxed" standard that focuses on the nexus between the plaintiff's claim and the defendants' contacts with the forum state. <u>Astro-Med</u>, 591 F.3d at 9; <u>Ticketmaster-New York</u> v. <u>Alioto</u>, 26 F.3d 201, 206-07 (1st Cir. 2004). Here, although the Bots are created in Florida, they are sold to customers in Massachusetts via the defendants' website. Those customers then use the Bots (in Massachusetts) in alleged violation of the game's Terms and Conditions which, in turn, purportedly causes harm to other, honest players. Plaintiff alleges that, as of February, 2010, Massachusetts was home to more Runescape players using the defendants' Bots than all but three other states. Therefore, notwithstanding the fact that the Bots are manufactured in Florida, plaintiff's claims are sufficiently related to defendants' Massachusetts activities.

## b. Purposeful Availment

To satisfy the second requirement, the Snellman brothers' "in-state contacts must represent a purposeful availment of the privilege of conducting activities" in Massachusetts, "thereby invoking the benefits and protections" of the laws of the Commonwealth. <u>Astro-Med,</u> 591 F.3d at 10. The purposeful availment factor focuses on voluntariness and foreseeability. <u>Ticketmaster</u> 26 F.3d at 207.

-6-

In cases involving internet commerce, personal jurisdiction operates on a sliding scale whereby the likelihood that jurisdiction can be exercised is "directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." Zippo Manufact. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (cited in Gather, Inc. v. Gatheroo, LLC, 443 F. Supp. 2d 108, 115 (D. Mass. 2006)). At one end of the spectrum are situations in which a defendant clearly does business in a foreign jurisdiction by entering into contracts with residents of that jurisdiction or by knowingly and repeatedly transmitting electronic files to those persons. At the opposite end are situations in which a defendant has simply posted information on a passive website that is accessible to users in a foreign jurisdiction. In the middle ground, there are websites in which a user can exchange information with a host user whereby:

> the exercise of jurisdiction is determined by analyzing the level of interactivity and commercial nature of the exchange of information that occurs on the website.

Id.

In this case, the defendants operate interactive websites that allow Massachusetts users to exchange payment information for software codes that enable the Bots to function. Although the defendants do not specifically seek out Massachusetts customers, they do not bar them or discourage them from

-7-

purchasing Bots.  Moreover, the defendants' websites are not
"passive" in nature and Massachusetts residents use the websites
to sign electronic agreements with the defendants and to purchase
and use their products.  Accordingly, the defendants have
purposefully availed themselves of the privileges of conducting
business in Massachusetts.

### c.  Reasonableness

In evaluating reasonableness, the Court considers a series
of "Gestalt factors," including 1) the defendant's burden of
appearing, 2) the forum state's interest in adjudicating the
dispute, 3) the plaintiff's interest in obtaining convenient and
effective relief, 4) the judicial system's interest in obtaining
the most effective resolution of the controversy and 5) the
common interests of all sovereigns in promoting substantive
social policies.  Burger King Corp. v. Rudzewicz, 471 U.S. 462,
477 (1985).

Here, none of the Gestalt factors weighs heavily for or
against the exercise of jurisdiction in Massachusetts.  Although
it would be less convenient for the defendants to defend the case
in Massachusetts, this factor is only significant when defendants
"can demonstrate some kind of special or unusual burden," which
they have not shown here.  Pritzker v. Yari, 42 F.3d 53, 64 (1st
Cir. 1994).  Second, because Massachusetts residents have been
affected by the defendants' actions, Massachusetts has an

-8-

interest in adjudicating the dispute, albeit not an especially
compelling one given that Massachusetts laws and policies are not
implicated.  The third factor is not particularly significant
because the plaintiff, a U.K. company, has no real connection to
Massachusetts other than the fact that many Runescape players
reside here.  The fourth and fifth factors are neutral because
there is no evidence that the dispute would be resolved more
effectively in one forum over another.  Accordingly, because most
of the Gestalt factors are neutral, jurisdiction in Massachusetts
is reasonable.

### 2.   Whether Venue is Proper in Massachusetts

Under 28 U.S.C. § 1391(a)(2), venue is proper in a district
"in which a substantial part of the events or omissions giving
rise to the claim occurred."  In making that determination, the
Court looks "not to a single triggering event prompting the
action," but takes a "holistic view" of the "entire sequence of
events underlying the claim."  Astro-Med, 591 F.3d at 12.  Venue
is often appropriate in multiple districts and the Court's task
is not to determine the best venue but merely a suitable one.
Id.  Here, the defendants' promotion and sale of their Bots over
the internet to Massachusetts residents, as well as the contacts
and contractual relationships they have established with those
residents, are sufficient to give rise to venue in this
jurisdiction.

###    3.    Whether Transfer to Florida is Warranted

In the alternative, the defendants request that the Court
transfer the case to the Middle District of Florida pursuant to
the federal transfer statute, 28 U.S.C. § 1404(a), which states:

> For the convenience of parties and witnesses, in the
> interest of justice, a district court may transfer any
> civil action to any other district or division where it
> might have been brought.

Under that statute, the Court must first determine whether the
case "might have been brought" in the suggested transferee
district and, if so, whether convenience and the interest of
justice favor transfer. In making that assessment, the Court
considers a number of factors, including 1) the relative
convenience of the parties and witnesses, 2) the law to be
applied and 3) the connection between the forum and the issues.
Coady v. Ashcroft & Gerea, 223 F.3d 1, 11 (1st Cir. 2000).
Although the decision to transfer a case under § 1404 lies solely
in the discretion of the Court, there is a strong presumption in
favor of the plaintiff's choice of forum and the burden of proof
rests with the party seeking transfer. Holmes Group, Inc. v.
Hamilton Beach/Proctor Silex, Inc., 249 F. Supp. 2d 12, 16 (D.
Mass. 2002).

Here, although the case "might have been brought" in the
Middle District of Florida, none of the relevant factors weighs
heavily in favor of transfer. Although it would be more
convenient for the defendants to litigate the case in their home

-10-

state, transferring venue to Florida would merely shift the inconvenience to the plaintiff. Moreover, it is too early to determine where the majority of the witnesses will be located and, given that most of the relevant documents are electronic, the physical location of such documents is inconsequential. Under the second and third factors, because federal law will be applied, neither state is substantially more connected to the issues and either would provide a suitable forum. Accordingly, defendants' request to transfer venue will be denied.

**B. Plaintiff's Motion for Preliminary Injunction [Docket No. 22]**

**1. Standard of Review**

To obtain preliminary injunctive relief under Fed. R. Civ. P. 65, a movant must demonstrate

(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships and (4) a fit (or lack of friction) between the injunction and the public interest.

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted). Likelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a "somewhat less" showing of another element. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) (citations omitted); E.E.O.C. v. Astra United States, Inc., 94 F.3d 738 (1st Cir. 1996).

In copyright and trademark cases, the first factor plays an

even greater role because the resolution of the other three factors will depend, in large part, on whether the plaintiff is likely to succeed in establishing infringement. Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006).

### 2.   Application

#### a.   Likelihood of Success on the Merits

##### i.   Copyright Infringement

Section 106 of the Copyright Act grants the owner of a copyright the exclusive right to "copy" the copyrighted work, i.e., to make a copy of the work, to prepare derivative works based on the work or to distribute copies of the work to the public. See 17 U.S.C. § 106(1)-(3). To prevail on a claim of copyright infringement, a party must demonstrate 1) ownership of a valid copyright and 2) copying the elements of the work that are original. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). A party may also contributorily infringe a copyright by "intentionally inducing or encouraging direct infringement of the copyright." MGM Studios v. Grokster, Ltd., 545 U.S. 913, 930 (2005).

Jagex alleges that it is the owner of several valid copyrights and that the Snellman brothers have directly infringed, and encouraged others to infringe, such copyrights. As explained above, the Bots sold on the defendants' websites

-12-

operate by downloading a copy of the Runescape game client (the software that connects to the game's server) and then use "reflection" to examine the program code. The Bots perform automated functions by running a script (a kind of software program) which tells them to perform specific tasks. The game client used by the Bots is licensed to a user under Runescape's Terms and Conditions, which state, inter alia, that the licensee

> must not use software to gain an unfair advantage [by using] automation tools, macros [or] bots [and] must not use any game specific, third-party software that encourages breaking of our rules.

Jagex asseverates that by 1) selling Bots which copy the game client and subsequently violate Runescape's Terms and Conditions and 2) encouraging others to buy and use those Bots, the Snellman brothers are directly and contributorily infringing its copyrights. In support of that claim, Jagex cites two recent cases from other districts involving similar allegations of copyright infringement of on-line products and services. In the first case, MDY Indus. LLC v. Blizzard Entertainment, Inc., 2008 WL 2757357, at * 1-10 (D. Ariz. June 14, 2008), the court allowed summary judgment for the plaintiff, the owner of an MMOG called "World of Warcraft," on a copyright infringement claim against the creator of a bot designed to cheat the game. In Ticketmaster LLC v. RMG Technologies, Inc., 507 F. Supp. 2d 1096, 1104-1111 (C.D. Ca. 2007), the court entered a preliminary injunction in favor of a website owner on its copyright claim against the

-13-

creator of automated device designed to enter and navigate the website.

Plaintiff's reliance on MDY and Ticketmaster is misplaced. In both of those cases, it was undisputed that the plaintiffs had copyrights on their websites and/or software. See MDY, 2008 WL 2757357, at *3; Ticketmaster, 507 F. Supp. 2d at 1104. Here, however, the plaintiff has not alleged infringement of its game client software or website because it does not own such copyrights. The 21 copyright registrations attached to the plaintiff's complaint are all Visual Arts registrations for various two-dimensional icons that appear in the Runescape game (such as an "anvil icon," an "archery icon" and a "chisel icon"), none of which the defendants currently use in their Bots or websites.[3]

The plaintiff responds that registration of its game client software is not a prerequisite to filing suit because Runescape, which was entirely developed and initially published in the United Kingdom, is not a "United States work," as defined by the Copyright Act. See 17 U.S.C. § 101 (defining "United States work"); 17 U.S.C. § 411 (requiring registration or preregistration of a copyright of a United States work prior to filing suit). That argument is unavailing. Even if the absence

---

Apparently, plaintiff complained to the defendants about the use of such icons in the spring of 2008 and, in response, the defendants removed all such icons from their product.

of a registered copyright for the Runescape software and game
client does not bar injunctive relief, it makes it unlikely that
the plaintiff will succeed on the merits of its copyright claim.

The plaintiff maintains, in the alternative, that the
defendants are still infringing its 21 Visual Arts copyrights
notwithstanding the fact that they have removed all such images
from their websites.  According to the plaintiff, when a player
downloads the defendants' Bots and uses them in the Runescape
game, which includes the 21 copyrighted images, he exceeds the
terms of his limited license and thus infringes the copyrights of
those images.

Plaintiff's argument is futile.  Even if the plaintiff's 21
copyrighted images are included in the Runescape software, it is
not at all clear that a Bot user infringes the copyrights of
those images when he plays Runescape in excess of his limited
license, particularly where the significance of such images
within the Runescape game has not been explained.  Thus, in the
absence of a registered copyright on the Runescape software, the
plaintiff has not demonstrated a substantial likelihood of
success on the merits of its copyright claim.

### ii.  Digital Millennium Copyright Act

The Digital Millennium Copyright Act ("DMCA"), which was
enacted to "strengthen copyright protection in the digital age,"
prohibits persons from manufacturing or providing any technology

-15-

or product that is "primarily designed or produced for the
purpose of circumventing a technological measure that effectively
controls access" to a protected work.  17 U.S.C. § 1201(a)(2);
Universal City Studios v. Corley, 273 F.3d 429, 435 (2nd Cir.
2001).  To establish liability under the DMCA, Jagex must
demonstrate that

> (1) the defendant[s] trafficked in a technology and (2)
> the technology was primarily designed or produced to
> circumvent conditional access controls to protected
> works, or has limited commercially significant use
> other than such circumvention.

CoxCom, Inc. v. Chaffee, 536 F.3d 101, 110 (1st Cir. 2008)
(internal citation omitted).

Jagex contends that the Bots, which allegedly download the
Runescape game client and use a process called "reflection" to
examine its internal operation, circumvent a "technological
measure" put in place by Runescape to protect its copyrighted
work.  Because the Bots are specifically designed to facilitate
cheating in the Runescape game, they have no commercially
significant purpose other than to circumvent Jagex's protective
measures.

Jagex's DMCA claim is untenable.  First, as explained above,
Jagex does not own a valid copyright for its software program or
game client.  Although it insists that copyright registration is
not a prerequisite to filing suit, the absence of that copyright
makes it difficult for plaintiff to succeed on it's the DMCA

-16-

claim which is dependent on proof of a valid copyright.

Second, Jagex has not indicated a specific "technological measure" that the defendants' Bots are circumventing.  A technological measure is generally a password, encryption program or other firewall device that regulates access to a protected work.  See MDY, 2008 WL 2757357, at * 11 (where game had a protection called a "warden" that scanned the user's computer for unauthorized programs and revoked access to the game upon detection of a infringing program); Ticketmaster, 507 F. Supp. 2d at 1111-1112 (where website had a computer security program that blocked automated access to its copyrighted pages by distinguishing between human users and computer programs).  In contrast, the Runescape website is generally accessible to the public and has no specific technological measure designed to block access to copyrighted works.  Accordingly, Jagex is unlikely to succeed on the merits of its DMCA claim.

### iii. Trademark Infringement

To prevail on a claim of trademark infringement, Jagex must show that 1) the mark "Runescape" is a valid, legally protectable trademark, 2) Jagex owns the mark and 3) the defendants' use of similar marks is likely to cause consumer confusion as to the origin of the goods.  See Three Blind Mice Designs Co. v. Cyrk, Inc., 892 F. Supp. 303, 309 (D. Mass. 1995).

Jagex alleges (and the defendants do not dispute) that it

-17-

owns Trademark Registration No. 2,829,952 for the mark RUNESCAPE
for use in entertainment services, including providing an online
multi-user computer games via local networks. It further
contends that the defendants, in connection with the sale and
marketing of Bots, are using the Runescape mark in a way that is
likely to cause consumer confusion. Specifically, the plaintiff
alleges that the defendants 1) promote the Bots on websites such
as "Runescape cheating asylum" (www.runescape.su), 2) use the
Runescape mark throughout such websites and 3) use an email
address ending in @runescape.su, causing consumers to believe
they are associated with or endorsed by Jagex.

        As the defendants point out, plaintiff's trademark claim is
likely moot because defendants have already removed all
potentially confusing references to Runescape from its websites.
Subsequent to the filing of the instant lawsuit, the defendants
1) disabled the website www.runescape.su, 2) changed the name of
their active website (www.rscheata.net) from "Runescape Cheating
Asylum" to "RS Cheating Asylum" and 3) began censoring their
customers' online discussions such that anytime a user posts the
word "Runescape" in a forum, it is automatically replaced with
"RS".

        The plaintiff insists that the defendants' actions do not
negate its trademark claim because the abbreviation "RS," for
which it owns a community trademark, is widely known to be

-18-

synonymous with Runescape.[4]  That argument is impotent.  Even if
the plaintiff has a registered community mark on the abbreviation
"RS," the defendants are not obviously using the mark to cause
consumer confusion.  It is clear from the name of the defendants'
website ("RS Cheating Asylum") that it does not promote a version
of the Runescape game itself but rather a program intended to
cheat that game.  Thus, because it is implausible that the
creator of a computer game would create a website that encourages
players to cheat at it, the likelihood of consumer confusion is
slim.  Accordingly, the plaintiff's Lanham Act claim is unlikely
to succeed.

### iv.  Computer Fraud and Abuse Act

Finally, plaintiff alleges that the defendants violated the
Computer Fraud and Abuse Act ("CFAA") by exceeding, and causing
others to exceed, authorized access to the Runescape game
software.  The CFAA makes it unlawful to:

> knowingly and with the intent to defraud ... exceed[]
> authorized access [of a protected computer], and by
> means of such conduct further[] the intended fraud and
> obtain[] anything of value.

18 U.S.C. § 1030(a)(4).

Plaintiff alleges that the defendants, by offering the Bots
for sale, exceed their authorized access to the Jagex server by
violating the Terms and Conditions as stated on the Runescape

---

A "community trademark" refers to a mark that is registered in
the European Union.

website, specifically the prohibition on "automation tools,
macros, bots, or autotypers [and] game-specific, third-party
software that encourages breaking of [Runescape's] rules."  The
defendants respond that the Runescape server does not qualify as
a "protected computer" under section 1030 because 1) the website
is available to anyone who accesses the internet and 2) players
can download the game client without ever seeing or agreeing to
the Terms and Conditions.

Defendant's argument is disingenuous.  Although a new player
can try out Runescape without agreeing to its Terms and
Conditions, such play is available only during a ten-hour trial
period.  After that initial period, the player exhausts all
content that is available in the introductory mode and, if she
wishes to continue to a higher level, she must register
officially and agree to the Terms and Conditions.

Nevertheless, even if Runescape's Terms and Conditions
transform its server into a "protected computer," plaintiff has
not demonstrated a strong likelihood of success on the merits of
its CFAA claim.  Notably, plaintiff fails to explain how the
defendants (as opposed to the Bots users) exceed authorized
access to the Runescape server, particularly where the defendants
are not alleged to have agreed to the game's Terms and
Conditions.

The plaintiff's theory of contributory liability under the

-20-

CFAA is also unpersuasive because the plaintiff has not cited any authority to support it. Cf. Doe v. Dartmouth-Hitchcock Medical Center, 2001 WL 873063, at *4-5 (D. N.H. July 19, 2001) (rejecting plaintiff's theory of vicarious liability under the CFAA and noting that the statute creates only a "limited private right of action against the violator") (emphasis in original). Thus, at least at this stage of the proceedings, plaintiff's allegations do not convince the Court that it is likely to succeed on its CFAA claim.

### b. Irreparable Harm

Jagex contends that, in the absence of an injunction, it will suffer irreparable harm in the form of loss of goodwill, damage to its reputation and immeasurable financial damages. Specifically, Jagex alleges that the defendants' actions have created a stigma surrounding Runescape and, as a result, members of the gaming community have chosen to play other MMOGs that are not riddled with cheaters. Jagex asserts that it has already had to invest time and resources into combating the intrusive software and resolving user complaints.

Although a showing of likelihood of success on the merits of its infringement claims presumes irreparable harm, see I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998), plaintiff has failed to make the requisite showing. Moreover, plaintiff's delay in filing suit and moving for injunctive relief

undermines its claim of irreparable harm. Jagex admits that it was aware of the defendants' allegedly infringing websites as early as April, 2008, but despite that knowledge, waited two years to file its complaint and another five months to move for a preliminary injunction. See Fritz v. Arthur D. Little, Inc., 944 F. Supp. 95, 99 (D. Mass. 1996) ("[A]n unreasonable delay between the time when a plaintiff is first apprised of the infringing acts and the time of filing suit will rebut the presumption of irreparable harm"). Although plaintiff insists that its motion for injunctive relief was triggered by the recent launch of defendants' new website, the Court finds that that site is insufficiently different from the defendants' prior sites to excuse the delay. See id. at 98 ("More harm is not necessarily any more irreparable, so long as it is not qualitatively different.").

### c. Balance of the Equities

If a plaintiff can demonstrate a likelihood of success on the merits of its infringement claims, the balance of the equities generally tips in its favor, particularly where the only hardship the defendant will suffer is lost profits. See Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, 843 F.2d 600, 612 (1st Cir. 1998). Here, however, Jagex has not made a strong showing of likelihood of success and, accordingly, the balance of the equities favors the defendants.

-22-

### d. Public Interest

Plaintiff has not demonstrated that the public interest will be furthered by entering an injunction. Even if the defendants' activities, which promote a culture of cheating, harm the gaming community as a whole, the plaintiff has not adequately proven that it is likely to succeed on the merits of its claims and, accordingly, injunctive relief is unwarranted.

### ORDER

In accordance with the foregoing, defendants' motion to dismiss or, in the alterative, to transfer venue (Docket No. 16) is **DENIED** and plaintiff's motion for preliminary injunction (Docket No. 22) is **DENIED**.

So ordered.

Nathaniel M. Gorton
United States District Judge

Dated August /6, 2010

-23-